Slip Op. 17-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>      Defendant. | Before: Claire R. Kelly, Judge<br><br>Court No. 15-00279 |

## OPINION

[Remanding to Commerce the final results of the ninth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam to reconsider or sufficiently explain its decision to use labor wage rate data from the shrimp industry in Bangladesh to value the labor factor of production in this review.]

Dated: March 16, 2017

Roop Kiran Bhatti and Nathaniel Jude Maandig Rickard, Picard, Kentz & Rowe, LLP, of Washington, DC, argued for plaintiff. With them on the brief was Andrew W. Kentz.

Kara Marie Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of Counsel on the brief was James H. Ahrens, II, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

      Kelly, Judge: This action comes before the court on Plaintiff's motion for judgment on the agency record pursuant to USCIT Rule 56.2. See Mot. Pl. Ad Hoc Shrimp Trade Action Committee J. Agency R. Under USCIT Rule 56.2, Apr. 20, 2016, ECF No. 27 ("Pl. 56.2 Mot."); Mem. L. Support Pl. Ad Hoc Shrimp Trade Action Committee's USCIT Rule 56.2 Mot. J. Agency R., Apr. 20, 2016, ECF No. 27 ("Pl.'s Br."). Plaintiff (or "Ad Hoc

Shrimp") challenges as unsupported by substantial evidence the Department of Commerce's ("Commerce") decision to use labor wage rate data from the Bangladeshi shrimp industry to value the labor factor of production in the final results of the ninth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam").  See Pl.'s Br. 15–39; see generally Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2013-2014, 80 Fed. Reg. 55,328 (Dep't Commerce Sept. 15, 2015) ("Final Results") and accompanying Issues and Decision Memorandum for the Final Results, (Sept. 8, 2015), ECF No. 18-2 ("Final Decision Memo"); Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 70 Fed. Reg. 5,152 (Dep't of Commerce Feb. 1, 2005) (amended final determination of sales at less than fair value and antidumping duty order) ("Order").

For the reasons that follow, Commerce's final determination is remanded for Commerce to clarify or reconsider its practice for determining whether a surrogate country's labor data is aberrational and to clarify or reconsider its use of Bangladeshi labor data in this review, despite record evidence that the data is from an industry affected by alleged labor abuses.

## BACKGROUND

In April 2014, Commerce initiated the ninth administrative review of the Order for the period February 1, 2013 through January 31, 2014.  See Initiation of Antidumping Duty Administrative Review and Request for Revocation in Part, 79 Fed. Reg. 18,262 (Dep't of Commerce Apr. 1, 2014) (initiation notice); see generally Order, 70 Fed. Reg. at

5,152.  As Commerce does when conducting an antidumping duty ("ADD") administrative review of a nonmarket economy ("NME") country,[1] Commerce invited interested parties to comment on the six potential surrogate countries Commerce had identified from which it would select the primary surrogate country and the data to value the factors of production ("FOP") used to produce the subject imports.  Certain Warmwater Shrimp from the Socialist Republic of Vietnam: Request for Surrogate Country and Surrogate Value Comments and Information, PD 272, bar code 3233128-01 (Oct. 3, 2014), ECF No. 60-1.

On March 9, 2015, Commerce published its preliminary results.  See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam, 80 Fed. Reg. 12,441 (Dep't Commerce Mar. 9, 2015) (preliminary results of ADD administrative review; 2013-2014) ("Prelim. Results") and accompanying Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review, A-552-802, (Mar. 2, 2015), available at  http://ia.ita.doc.gov/frn/summary/vietnam/2015-05474-1.pdf (last visited March 13, 2017) ("Prelim. Decision Memo").  After considering comments from interested parties on surrogate country and surrogate values, Commerce selected Bangladesh as the primary surrogate country for purposes of valuing the mandatory respondents' FOPs for the preliminary results.  See Prelim. Decision Memo at 12–17.  Regarding the labor factor of

---

[1] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  19 U.S.C. § 1677b(c)(1).

production, Commerce explained its practice to value the labor input using industry-specific labor wage rate data from the primary surrogate country, and accordingly chose to use Bangladeshi labor wage rate data to value the labor input. Id. at 26–27. Commerce explained that, although it considers the International Labor Organization ("ILO") Yearbook of Labor Statistics Chapter 6A: Labor Cost in Manufacturing ("ILO Chapter 6A data") to be the best source of data for industry-specific labor rates,[2] because the ILO does not include labor data for Bangladesh, Commerce would use labor wage rate data for the shrimp industry published by the Bangladesh Bureau of Statistics ("BBS"), a Bangladeshi government source. Id. at 26; Antidumping Duty Administrative of Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary Results, A-552-802, at 6, PD 504, bar code 3262270-01 (Mar. 2, 2015), ECF No. 56-6 ("Prelim. Surrogate Value Memo").

On September 15, 2015, Commerce published its final determination. Final Results, 80 Fed. Reg. at 55,328. Commerce continued to use Bangladesh as the primary surrogate country, see id. at 55,330; Final Decision Memo at 46–48, and, over objections by Ad Hoc Shrimp, continued to use Bangladeshi shrimp industry labor wage rate data to value the labor factor of production. Final Decision Memo at 46–55; Antidumping Duty

---

[2] Commerce stated erroneously in the Preliminary Decision Memo that its practice is to use ILO Chapter 5B data to value labor wage rates. See Prelim. Decision Memo at 26. Commerce in fact uses ILO Chapter 6A data to value labor wage rates. Prelim. Surrogate Value Memo at 6; Labor Methodologies, 76 Fed. Reg. at 36,093. The Labor Methodologies policy notice published by Commerce in June 2011 notes that ILO Chapter 6A data would thenceforth be used to value labor wage rates, "on the rebuttable presumption that Chapter 6A data better accounts for all direct and indirect labor costs" than does ILO Chapter 5B data. Labor Methodologies, 76 Fed. Reg. at 36,093. Commerce stated this practice correctly in its Preliminary Surrogate Value Memo and in its Final Decision Memo in this review. See Prelim. Surrogate Value Memo at 6; Final Decision Memo at 46.

Administrative of Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Surrogate Values for the Final Results, A-552-802, PD 574, bar code 3303461-01 (Sept. 8, 2015), ECF No. 56-15; see Ad Hoc Shrimp Trade Action Committee Case Brief at 1–37, Jun. 8, 2015, PD 563, bar code 3282504-01 ("Ad Hoc Shrimp Admin. Case Br.").

   Plaintiff challenges Commerce's decision to use Bangladeshi shrimp industry labor wage rate data to value the labor FOP.   It contends that the Bangladeshi data is aberrational as it is influenced by labor abuses, including forced and child labor, throughout the Bangladeshi shrimp industry and is therefore an unreliable basis for valuing the labor FOP.  See Pl.'s Br. 15–35; Pl. Ad Hoc Shrimp Trade Action Committee's Reply Mem. R. 56.2 Mot. J. Agency R. 4, 14, Oct. 28, 2016, ECF No. 43 ("Pl.'s Reply"). Plaintiff argues that the use of this data renders the final results of the review unsupported by substantial evidence.  See Pl.'s Br. 15–35; Pl.'s Reply 11–21.  Defendant United States responds that the court should sustain Commerce's determinations in the final results, including Commerce's decision to use Bangladeshi labor wage rate data for the shrimp industry, as the determination is supported by substantial evidence.  See Def.'s Resp. Opp'n Pls.' Rule 56.2 Mots. J. Agency R. 13–23, Sept. 28, 2016, ECF No. 42 ("Def.'s Resp.").[3]

---

[3]  On November 19, 2015, Vietnam Association of Seafood Exporters and Producers and its individual member companies (collectively "VASEP") joined the present action as Defendant-Intervenors on consent of the parties.  See Order, Nov. 19, 2015, ECF No. 16.  VASEP had previously initiated a separate proceeding challenging, on different grounds than Ad Hoc has challenged here, Commerce's final determination in the ninth administrative review of the Order at issue in the present action.  See Vietnam Association of Seafood Exporters and Producers,

(footnote continued)

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012),[4] which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Plaintiff argues that Commerce's use of labor wage rate data from the Bangladeshi shrimp industry to value the labor FOP is unsupported by substantial evidence, an abuse of discretion, and arbitrary and capricious due to alleged widespread labor abuses in the Bangladeshi shrimp industry that render the data aberrational and unreliable.  Pl. Br. 14–38.  Defendant responds that Commerce's use of the Bangladeshi labor wage rate data to value the labor FOP is supported by substantial evidence and contends that Commerce reasonably determined that the Bangladeshi data is the best available information on the record, as the Bangladeshi data is neither aberrational nor unreliable.  Def.'s Resp. 10.  For the reasons that follow, the matter is remanded to Commerce to further explain, or reconsider, its decisions: 1) to forgo any comparison of Bangladeshi labor wage rate data

---

et al. v. United States, Court No. 15-00284.  On December 21, 2015, the court consolidated the two actions, making VASEP Consolidated Plaintiffs in the present action.  Order, Dec. 22, 2015, ECF No. 21.  On Nov. 22, 2016, the court granted VASEP's motion to withdraw from the litigation.  Order, Nov. 22, 2016, ECF No. 54.  Accordingly, VASEP are no longer either Consolidated Plaintiffs or Defendant-Intervenors in this action.

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

to other labor wage rate data on the record, and 2) to use labor wage rate data from Bangladesh despite record evidence that such data was aberrational because of widespread labor abuses in the Bangladeshi shrimp industry.

Commerce determines the existence of dumping by comparing the normal value of the subject merchandise with the actual or constructed export price of the merchandise. 19 U.S.C. § 1677b(a).   The normal value of the merchandise is the price of the merchandise when sold for consumption in the exporting country.   19 U.S.C. § 1677b(a)(1).  However, when the exporting country is an NME country, the normal value may not reflect the fair value of the merchandise.  See 19 U.S.C. § 1677(18)(A).  As a result, Commerce calculates the normal value for subject merchandise from an NME country by valuing the NME country's FOPs[5] "based on the best available information[6] regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1); see 19 C.F.R. §§ 351.408(a)–(c).[7]  Commerce selects as a surrogate for each FOP a market economy

---

[5] The FOPs include, but are not limited to, "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

[6] As "best available information" is not statutorily defined, Commerce has discretion to determine what data constitutes the best available information in a given case and to value the FOPs accordingly.  See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011); Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (Commerce has considerable discretion in choosing the surrogate values that most accurately reflect the price that the NME producer would have paid had it purchased the FOP from a market economy country). This discretion is broad but is not unlimited; "the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible."  Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

[7] Further citations to Title 19 of the Code of Federal Regulations are to the 2014 edition.

country that is economically comparable to the NME country and a significant producer

of the merchandise in question.  19 U.S.C. § 1677b(c)(4)(A)–(B); 19 C.F.R. § 351.408(b).

Commerce has a regulatory preference to value all FOPs using data from a single

surrogate country, 19 C.F.R. § 351.408(c)(2), and determines what data constitutes the

best information by using criteria developed through practice.[8]   Qingdao Sea–Line

Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  Commerce values

labor using industry-specific data from the primary surrogate country, as published in

Chapter 6A of the ILO Yearbook of Labor Statistics.  Antidumping Methodologies in

Proceedings Involving Non Market Economies: Valuing the Factor of Production, Labor,

76 Fed. Reg. 36,092, 36,093 (Jun. 21, 2011) ("Labor Methodologies"); see Final Decision

Memo at 46.  Where ILO rates are not available, Commerce's practice is to use industry-

specific labor wage rate data from the primary surrogate country.  Final Decision Memo

at 46, 48.

For all FOPs, including labor, Commerce seeks the best available information due

to its statutory directive and as part of its mandate to determine dumping margins as

accurately as possible.  Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed.

Cir. 1990).  Commerce has acknowledged that aberrational values should not be used.

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (May 19, 1997).

---

[8] To determine what constitutes the best available information, Commerce evaluates the quality
and reliability of data sources from the countries offered to value respondents' FOPs favoring data
that is: (1) specific to the input in question; (2) representative of a broad market average of prices;
(3) net of taxes and import duties; (4) contemporaneous with the period of review; and (5) publicly
available.  See generally Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate
Country    Selection    Process,    Policy    Bulletin    04.1    (2004),    available    at
http://ia.ita.doc.gov/policy/bull04-1.html (last visited March 13, 2017); see also Qingdao Sea–Line
Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

Where there is evidence that data is aberrational, Commerce must address that evidence in order to demonstrate that the data is nonetheless the best information available.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.")

Commerce claims that, to assess whether data is aberrational, it does a quantitative assessment.  Final Decision Memo at 49.  According to Commerce, its "practice in analyzing whether a given value is aberrational or distortive, is to compare the prices for an input from all countries found to be at a level of economic development comparable to the NME whose products are under review from the [period of review] and prior years."  Id.  Commerce states that its practice requires that the record "contain specific quantitative evidence showing the value is aberrational."  Id.[9]  Nonetheless, Commerce's stated practice is not to view data as aberrational simply because the data is of low value or the lowest value.  Id. at 48–49 (citing Commerce's determination in the eighth administrative review of the Order and Camau Frozen Seafood Processing Import Export Corp. v. United States, 37 CIT __, __, 929 F. Supp.2d 1352, 1356 (2013)).

---

[9] Commerce argues that "Petitioner appears to have abandoned its argument that BBS data are aberrational because the wage rates are low."  Final Decision Memo at 49.  This is a mischaracterization.  It is obvious to the court that Plaintiff's allegation is that the labor wage rate data is aberrational because it is the lowest value as a result of the alleged labor abuses.  In fact, Commerce's Preliminary Decision Memo demonstrates that Commerce understood that claim.  See Prelim. Decision Memo at 12 (noting that Ad Hoc Shrimp "contends that the Department cannot select Bangladesh as the primary surrogate country because of alleged labor abuses and alleged oppressive conditions in the shrimp industry in Bangladesh result in aberrational labor wage rate.").

Commerce's selection of Bangladeshi labor wage rate data is not supported by substantial evidence because Commerce failed to (i) quantitatively assess Plaintiff's claims that the Bangladeshi labor wage rate data was aberrational, and (ii) address record evidence that the Bangladeshi data was the product of abusive labor practices and therefore could not be the best available information to value the merchandise.  In this proceeding, Commerce selected Bangladesh as the primary surrogate country.  See Final Decision Memo at 46–48.  Commerce used labor wage rate data for the Bangladeshi shrimp industry published by the BBS,[10] despite Plaintiff's claims that the data was aberrational.  Id. at 48.  Commerce determined that the BBS data was the best information available because it was from the primary surrogate country, id., and emphasized that the BBS data was public, more contemporaneous to the period of review than other data on the record, and specific to the shrimp industry.  Id. at 53.  Commerce also emphasized that using non-ILO data from the primary surrogate country was consistent with its practice in previous similar circumstances.  Id.

Despite Commerce's stated practice of quantitatively assessing labor wage rate data to determine whether that data is aberrational, Commerce did not perform a quantitative assessment of the BBS data with the labor wage rate data presented by Plaintiff.  Commerce states that "Petitioner has not argued that the Bangladeshi wage rate from BBS is aberrational compared to the other wage data from those countries."  Id.

---

[10] As explained, Commerce's practice is to use ILO data from the primary surrogate country where possible.  See Final Decision Memo at 46; Labor Methodologies.  Although Bangladesh does not report labor data to the ILO, Commerce chose to use alternate labor wage rate data from Bangladesh, rather than ILO data from another potential surrogate country, to value Vietnam's labor FOP.  See Final Decision Memo at 46–48.

at 50.  Yet, as Commerce acknowledged, Plaintiff did place labor wage rate data on the

record from other countries, specifically from Guyana, India, Nicaragua, and Philippines.

See id.; Factual Information to Value FOPs, PD 497–499, bar code 3260348-01 (Feb. 2,

2015) ("Factual Info to Value FOPs"), and argued that the labor wage rate data from these

countries is reliable, see id., while Bangladeshi data is aberrational.  Ad Hoc Shrimp Pre-

Prelim. Comments at 2–4, PD 500, bar code 3260507-01 (Feb. 19, 2015) ("Ad Hoc

Shrimp Pre-Prelim. Comments"); Ad Hoc Shrimp Admin. Case Br. at 26–33.  In its brief

before this court, Defendant contended that Plaintiff failed to make the necessary

connections between its argument of aberration and the data it submitted to Commerce

because Plaintiff did not convert the other country data values so that a comparison could

be made to the data values for Bangladesh.  See Def. Resp. 18; Oral Argument 00:19:38–

00:19:45, 00:20:12–00:20:27; 00:20:50–21:04, 00:29:25–00:30:22, 00:31:21–00:31:47,

00:47:18–00:47:52, Jan. 27, 2017, ECF No. 58 ("Oral Argument").  Defendant at oral

argument conceded that Commerce could have made the conversion.  Oral Argument

00:33:52–00:34:30.  Moreover, in memorandum on the record, Commerce acknowledges

the relative labor wage rate data on the record for Bangladesh and other countries.  See,

e.g., Final Decision Memo at 43 (summarizing Ad Hoc Shrimp's arguments that "wage

rates from Bangladesh's shrimp industry are less reliable than those reported by the [ILO]

for other market countries that are at similar levels of economic development as Vietnam"

and that "[r]eliable, non-aberrational wage rate data, available from the ILO, is on the

record and should be used to value the labor."), 44 (noting that Ad Hoc Shrimp claimed it

"submitted non-aberrational wage rate information that could be used to value the labor

FOP"), 47 ("In the Preliminary Results, we declined to use [Ad Hoc Shrimp's] preferred

labor data from other various countries . . ."), 50 ("[Ad Hoc Shrimp] also submitted one

set of suggested wage rates from India (from 2004-2005), Guyana (not on the Surrogate

Country List, from 2007), Philippines (from 2008) and Nicaragua (from 2006), suggesting

that the wage data from any of these countries is preferable (and more reliable) than the

BBS data.").  Therefore the court finds unpersuasive Defendant's positions that Ad Hoc

Shrimp did not sufficiently argue to Commerce that the Bangladeshi labor wage rate data

was aberrational and that Commerce was not provided with sufficient information to

compare the labor wage rate data.

Moreover, even if Commerce did not have sufficient labor wage rate data to

comparatively assess the aberration claim, Commerce subsequently indicated that it

could not perform a quantitative analysis because of the uniqueness of the labor FOP.

See Final Decision Memo at 50. Shortly after stating that its practice was to make a

quantitative assessment with respect to claims of aberrational data, id. at 49 ("Our

practice in analyzing whether a given value is aberrational or distortive, is to compare the

prices for an input from all countries found to be at a level of economic development

comparable to the NME whose products are under review from the [period of review] and

prior years"), Commerce cites a recent proceeding for the proposition that quantitative

cross country comparisons cannot be made for labor wage rate data, stating that,

> while there is a strong global relationship between wage rates and GNI,
> significant variation exists among the wage rates of comparable market
> economies. There are many socio-economic, political and institutional
> factors, such as labor laws and policies unrelated to the size or strength of
> an economy, that cause significant variances in wage levels between
> countries.   For these reasons, and because labor is not traded

> internationally as other commodities are, the variability in labor rates that exists among otherwise economically comparable countries is a characteristic unique to the labor input.

Id. at 50 (quoting Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, A-570-979, at 23 (October 9, 2012), available at http://ia.ita.doc.gov/frn/summary/prc/2012-25580-1.pdf (last visited March 13, 2017)).  Commerce specifically rejected the notion that a comparison could be made in this case amongst labor wage rate data from different countries.  Final Decision Memo at 50 ("Here, the Department does not find that wage data from other countries are necessarily appropriate benchmarks with which to compare the Bangladeshi BBS wage data as there are other variables that affect the labor rates across countries.").  Commerce appears to be saying that Plaintiff must show that a quantitative comparison of labor wage rate data must be made, but that the comparison cannot be made using labor wage rate data from different countries.  Logically, Commerce leaves only one path by which a Plaintiff can demonstrate aberration, which is by a comparison of a country's current data to that country's historic wage rate data.  Although Commerce never clearly states its practice, if this is Commerce's practice, it is unreasonable in an instance where, such as here, Plaintiff claims that the aberrational labor wage rate data results from widespread labor abuses in the surrogate country.  See generally Ad Hoc Shrimp Admin. Case Br. at 8–26.  To ask Plaintiff to demonstrate that labor wage rate data is aberrational solely through a historical quantitative analysis within one country when the claim is that there are labor abuses in that one country leading to the low wages makes no sense.  As a

matter of common sense, it is possible, if not likely, that the abuses complained of have been in existence for some time, making a historical analysis useless.  Upon remand Commerce must clarify or reconsider its practice with regard to how parties can demonstrate that labor wage rate data is aberrational where the claim of aberration stems from alleged widespread labor abuses in the industry.  If Commerce allows cross country comparisons, then Commerce should address the record data and thus confront the important aspect of the problem presented by the Plaintiff.  See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner.").

Relatedly, Commerce fails to address Plaintiff's arguments and record evidence that the low labor wage rate data is the function of abusive labor practices, making Bangladeshi labor wage rate data aberrational, unreliable, and not the best information available.  Plaintiff placed on the record extensive evidence of alleged widespread labor abuse within the Bangladeshi shrimp industry.  See Ad Hoc Shrimp Comments on Surrogate Values, PD 370–374, bar code 3247044-01 (Dec. 15, 2014) ("Ad Hoc Shrimp Surrogate Value Comments"); Factual Information to Value FOPs; Ad Hoc Shrimp Pre-Prelim. Comments; Ad Hoc Shrimp Admin. Case Br. at 8–26.  In addition to its administrative case brief, Plaintiff made three pre-preliminary filings on the record before Commerce to present and support its position that Bangladeshi labor wage rate data is aberrational due to widespread labor abuses in the Bangladeshi shrimp industry and should therefore not be used as the surrogate data to value the labor factor of production in this review.  See generally Ad Hoc Shrimp Surrogate Value Comments; Factual

Information to Value FOPs; Ad Hoc Shrimp Pre-Prelim. Comments.   This evidence detracts from Commerce's finding that "the BBS data remains the best information available on record of this review to value labor."  Final Decision Memo at 53; <u>Shakeproof Assembly Components v. United States</u>, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible.").

First, on December 15, 2014, Ad Hoc Shrimp submitted to Commerce publicly available information documenting widespread labor abuses "permeating the entire supply chain of the Bangladesh shrimp industry."   Ad Hoc Shrimp Surrogate Value Comments at 2.  In this filing, Ad Hoc Shrimp presented evidence, published by a myriad of news, governmental, intergovernmental, and NGO sources detailing exploitive labor conditions in the Bangladeshi shrimp industry, including forced and child labor and conditions with a logical link to wage rates, such as significant underpayment, excessive working hours, non-payment for overtime, and unequal payment for women.  <u>See</u> <u>id.</u>

Second, on February 2, 2015, Ad Hoc Shrimp submitted to Commerce information to assist Commerce in valuing the factors of production in this review.  <u>See</u> Factual Information to Value FOPs.  In this filing, Ad Hoc Shrimp provided additional information and recent publications regarding the conditions of the Bangladeshi shrimp industry and ILO shrimp industry labor wage rate data for Guyana, India, Nicaragua, and Philippines, "each a significant producer and exporter of shrimp, [which] provide a nonaberrational basis by which to value the labor FOP for the purposes of this proceeding."  <u>Id.</u> at 6.

Finally, on February 19, 2015, Ad Hoc Shrimp submitted pre-preliminary comments to Commerce, contending that labor wage rate data for the shrimp industry in Bangladesh, which Commerce had used in prior administrative reviews of the Order, are aberrational and should not be used by Commerce as the surrogate values by which to value the labor factor of production for mandatory respondents in this review.  See Ad Hoc Shrimp Pre-Prelim. Comments at 2–4.  Ad Hoc Shrimp stated that

> The record of this review does not include any of the wage rate data related to Bangladesh previously relied upon by the Department. Thus, unless the Department independently places such information on the record of this proceeding, there is no basis upon which to value the labor FOP with Bangladeshi data. Should the Department elect to exercise discretion to supplement the record of this review with Bangladeshi wage rate information – rather than utilize wage rate information currently on the record of this proceeding – the evidence already on the record of this proceeding requires the agency to confront a colorable claim that data that the Department would be considering is aberrational. Accordingly, the Department would be obligated to examine these data and provide a reasoned explanation as to why the data chosen is reliable and non-distortive. This obligation is all the more pertinent in a proceeding where non-aberrational values are already on the record of the review.

Id. at 4.  As evidenced by these filings, Plaintiff anticipated that Commerce might consider Bangladeshi labor wage rate data and alerted Commerce to its concerns regarding that data.

Thereafter, in its case brief before Commerce following publication of the preliminary results, Ad Hoc Shrimp objected to Commerce's use of the BBS labor wage rate data and again documented allegations of widespread labor abuses including forced and child labor in the Bangladeshi shrimp industry.  Ad Hoc Shrimp Admin. Case Br. at 8–26.  Ad Hoc Shrimp cited and included excerpts from the hundreds of pages of reports and articles it previously placed on the record detailing abuses, including forced and child

labor, throughout the industry.  For example, Ad Hoc Shrimp excerpted a report detailing an interview with a shrimp processing worker who reported having been "forced to work day and night without any break," for up to 48 hour shifts, while pregnant during peak processing season.  Id. at 17 (internal citations and quotation omitted).  Ad Hoc Shrimp highlighted another report, based on 385 interviews of shrimp industry workers in 2009, detailing instances of induced indebtedness, wage withholding, exposure to health hazards, and child labor.  Id. at 18.  This source emphasized the "grossly unequal pay [for women] and rampant sexual abuse" throughout the industry.  Id. at 20.  Another report stated that "[m]any workers said children younger than 14 are working in their factories."  Id. at 21.   This record evidence included reports from the United States Trade Representative, the ILO, various international NGOs, and various media sources.[11]

Commerce simply did not respond to this evidence.  It is clear from Ad Hoc Shrimp's submissions that it claimed not only that the Bangladeshi labor wage rate data was the lowest on the record but that it was the lowest because of these widespread labor abuses and therefore that the data could not be used as a surrogate for Vietnamese labor wage rate data.   See Ad Hoc Shrimp Admin. Case Br. at 26 ("The record of this proceeding . . . demonstrates that such conditions [in the Bangladeshi shrimp industry] are not only different from major shrimp producing countries at similar levels of economic development, they are also different from conditions in which Vietnam's shrimp industry

---

[11] Ad Hoc Shrimp also argued to Commerce that the suspension of Bangladesh's status as a beneficiary developing country under the Generalized System of Preferences ("GSP") program further supports finding the labor wage rate data from the shrimp industry aberrational.  Ad Hoc Shrimp Admin. Case Br. at 11–12.  The United States suspended Bangladesh from the GSP program in 2013 because Bangladesh "has not taken or is not taking steps to afford internationally recognized worker rights to workers in the country."  Id.

operates."); Ad Hoc Shrimp Surrogate Value Comments at 8–9 (noting that the circumstances in the Bangladeshi shrimp industry "are distinguishable from those that are present in the labor market in Vietnam.. . . [I]n Vietnam, labor costs continue to rise, as the Government grants greater and greater levels of protection to Vietnam's working force, including social security and safety measures.  No similar trend is apparent in Bangladesh.").

Instead of addressing these claims, Commerce argued that prior opinions of this Court had affirmed its prior findings that simply having the lowest value data is not sufficient to show that data is unreliable.  Final Decision Memo at 49.  Commerce's explanation is nonresponsive.  Commerce's obligation to secure the best information is meant to foster accuracy.  <u>Shakeproof Assembly Components</u>, 268 F.3d at 1382. Evidence that the labor wage rates do not reflect the true cost of labor because of systemic abuses including forced and child labor specific to the shrimp industry detracts from accuracy and therefore detracts from the reasonableness of finding the data to be the best information available. <u>See</u> Ad Hoc Shrimp Admin. Case Br. at 4; Ad Hoc Shrimp Pre-Prelim. Comments at 3.

Further, in enacting 19 U.S.C. § 1677b(c)(1), Congress directed Commerce to construct a market price for NME merchandise by using comparable market economy surrogate prices that accurately reflect how FOPs would be priced in a market-driven economy of similar development.  <u>See</u> 19 U.S.C. § 1677b(c)(1).  It is reasonable to presume that an industry with abusive labor practices, including child labor and forced labor as is alleged here, is not a fair surrogate by which to construct a market price for

these NME goods.  See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1378

(Fed. Cir. 1999) ("There is no reason, either under [19 U.S.C. § 1677b(c)(1)] or in logic,

to incorporate the distortions in [a particular market economy country industry] into a

hypothetical [NME country] market pursuant to a factors of production assessment merely

because [that market economy country] has been chosen as the surrogate country.").

Commerce's reply to the record evidence is simply non-responsive and fails to meet the

standard for substantial evidence.    Universal Camera Corp., 340 U.S. at 488 ("The

substantiality of evidence must take into account whatever in the record fairly detracts

from its weight.").  Upon remand Commerce must explain why this evidence is insufficient

to support the claim that Bangladeshi labor wage rate data is aberrational as a function

of the alleged abuses or explain why, despite this evidence, the Bangladeshi labor wage

rate data nonetheless remains the best available information, or must reconsider its

determination.

Defendant contends that Plaintiff insufficiently made its argument to Commerce,

because Plaintiff "never actually tied any of that data, such as the alleged labor abuse

practices, to why the Bangladeshi labor rate is the way it is."  Oral Argument 00:20:17–

00:20:27; Def.'s Resp. 18.  This argument is unpersuasive.  As discussed above, through

a series of filings, even prior to the preliminary determination, Plaintiff stressed to

Commerce its concerns with the potential use of Bangladeshi labor wage rate data.

Specifically, Plaintiff sought to emphasize that Bangladeshi labor wage rate data would

not only be low value data but would be low value data because of serious and ongoing

labor abuses in the Bangladeshi shrimp industry.  See, e.g., Ad Hoc Shrimp Surrogate

Value Comments at 8 (highlighting evidence to demonstrate that the "oppressive conditions that exist for shrimp processing workers in Bangladesh [result] in an aberrational labor wage rate that would only be fairly representative of conditions in countries with shrimp processing sectors that tolerate similar levels of grotesque human rights abuses."); Ad Hoc Shrimp Pre-Prelim. Comments at 3 (noting that Ad Hoc Shrimp "present[ed] specific record evidence demonstrating both that (1) labor values reported in Bangladesh are aberrationally low; and (2) specific reasons why such values are aberrationally low and, as such, cannot constitute the best available information to determine the labor FOP.").  Commerce was clearly able to connect the dots between Plaintiff's evidence and its argument against using Bangladeshi data, as in its preliminary results, Commerce stated that Ad Hoc Shrimp "contends that the Department cannot select Bangladesh as the primary surrogate country because of alleged labor abuses and alleged oppressive conditions in the shrimp industry [that] result in [an] aberrational labor wage rate."   Prelim. Decision Memo 12. Although Commerce was responding to an argument concerning the selection of a primary surrogate country, Commerce nonetheless demonstrated an understanding of Plaintiff's allegations.  Plaintiff reiterated this point explicitly in its administrative case brief submitted to Commerce following publication of the preliminary results and Commerce's preliminary selection of the BBS data to value the labor FOP.  See Ad Hoc Shrimp Admin. Case Br. at 26 ("Wage rate data reported by BBS are aberrational not because these wage rates are low[, . . . but] because these wage rates are determined by conditions unique to the operations of Bangladesh's shrimp industry that result in artificially depressed and suppressed labor costs that are

exceptional amongst major shrimp producers at similar levels of economic

development."). Commerce acknowledged Plaintiff's data and argument in its summary

in the Final Decision Memo, noting, inter alia, that Plaintiff contended that "the record of

this review demonstrates that [Bangladeshi labor wage rate data on the record is]

aberrational because of rampant and widespread abuse of worker rights in Bangladesh .

. . ." Final Decision Memo at 43. This statement further demonstrates Commerce's

understanding of Plaintiff's allegations.   Nevertheless, Commerce's only substantive

response to these arguments was to reiterate that this Court previously affirmed that a

mere finding that Bangladeshi labor wage rate data was the lowest on record was

insufficient to demonstrate that the data was aberrational.  <u>See</u> Prelim. Decision Memo

at 16; Final Decision Memo at 48–49.[12] Commerce failed to confront Plaintiff's arguments

---

[12] Commerce reasoned that,

> to the extent that [Ad Hoc Shrimp] argues that the BBS labor value is aberrational
> because it is the lowest among potential labor values, the argument has been
> previously addressed and rejected by the Department and the CIT. When
> determining whether data is aberrational, the Department has found that the
> existence of higher or lower prices alone does not necessarily indicate that the
> price data is distorted or misrepresentative, and thus is not a sufficient basis upon
> which to exclude a particular SV. This is a CIT-affirmed practice. . . .  The record
> must contain specific quantitative evidence showing the value is aberrational.
> Petitioner has not provided such evidence.

Final Decision Memo at 49. Commerce chooses not to respond to the claim that not only are the
values the lowest but they are the lowest because they are a function of widespread labor abuses.
     Moreover, the claim that Plaintiff failed to provide specific quantitative evidence appears
to be contradicted by record evidence which Commerce does not address. <u>See</u> Factors to Value
Labor FOPs.   Rather than addressing this evidence, Commerce summarily discounts it by
claiming that Commerce cannot compare labor wage rates between countries.  Final Decision
Memo at 50.  Commerce was required to address this evidence. <u>See</u> <u>Universal Camera Corp. v.</u>
<u>NLRB</u>, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the
record fairly detracts from its weight.").

and record evidence in this case that the Bangladeshi labor wage rate data was aberrational not just because the rates were the lowest on the record but because the labor wage rates are the product of systemic labor abuses, including forced and child labor abuses, specifically within the Bangladeshi shrimp industry.[13]  See Final Decision Memo at 48–49; Prelim. Decision Memo at 16.

Commerce contends that it "has no authority, under the antidumping duty statute, to make socio-political determinations, or analyze socio-political factors and their potential impact on the valuation of [FOPs]."  Final Decision Memo at 55.  Commerce further specified that it does not base surrogate value determinations "on any criteria other than specificity, contemporaneity, whether the value is a broad market average, publicly available, or tax/duty exclusive."  Id. at 54–55.  According to Commerce, socio-political factors are inapposite to its determination under 19 U.S.C. § 1677b(c)(1)(B) and beyond its realm of expertise.  Id. at 52–55.  However, Commerce is not being asked to "make socio-political determinations, or analyze socio-political factors and their potential impact on the valuation of [FOPs]," id. at 55; Commerce is being asked to follow its own practice.

---

[13] In its Final Decision Memo, Commerce did respond to Ad Hoc Shrimp's argument that "Bangladeshi wage rate data should not be used because of rampant child and forced labor practices, [and that Commerce should instead] rely on ILO wage data from India, Philippines, Guyana or Nicaragua."  Final Decision Memo at 55.  Commerce argued that "the source upon which [Ad Hoc Shrimp] relies to disqualify Bangladesh due to child and forced labor also lists India, Philippines, and Nicaragua (the countries that Petitioner put forward for consideration) as countries using child and forced labor."  Id. (citing Ad Hoc Shrimp Surrogate Value Comments, Ex. 3, Table 3: List of Goods Produced by Child Labor or Forced Labor-Sorted by Country).  However, the cited table does not demonstrate the existence of forced or child labor abuses in the shrimp industry of India, Nicaragua, or Philippines, but rather demonstrates the existence of forced and/or child labor in other industries in each of those countries.  According to the same table, Thailand, Cambodia, Burma, and Bangladesh are the countries known to have forced or child labor within the shrimp industry.  See Ad Hoc Shrimp Surrogate Value Comments, Ex. 3, Table 3: List of Goods Produced by Child Labor or Forced Labor-Sorted by Country.

Its practice is to not use aberrational data.  <u>See</u> <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. at 27,366.  Commerce has been presented with a claim that the Bangladeshi labor wage rate data on the record is aberrational because it is of low value allegedly due to widespread labor abuse in the Bangladeshi shrimp industry.  Widespread labor abuses undermine the market-based approach that Congress sought by requiring that Commerce use surrogate values when calculating normal value for subject merchandise from NME countries, so Commerce must address Plaintiff's claims. <u>Universal Camera Corp.</u>, 340 U.S. at 488.

Commerce claims that Plaintiff is "confusing the question of labor conditions with the question of data accuracy."  Final Decision Memo at 52.  Commerce reiterates that its practice is to "conside[r] several factors including whether the [surrogate value] is publicly available, contemporaneous with the [period of review], represents a broad market average, is tax- and duty-exclusive, and is specific to the input," and argues that its mandate "does not include remediation of socio-political or socio-economic issues." <u>Id.</u>  Nonetheless, it is also Commerce's stated practice not to use aberrational data. <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. at 27,366.  Plaintiff is not arguing for Commerce to remediate the labor conditions in Bangladesh; Plaintiff is simply arguing that Commerce consider whether those labor conditions and the fact that the Bangladeshi labor wage rate data is the lowest on the record demonstrate that the data is aberrational.

Commerce states that Plaintiff must provide "specific quantitative evidence that these socio-political issues in Bangladesh had a distortive impact on the BBS data on the

record." Final Decision Memo at 52. However, as stated above, if Commerce will not consider cross country labor wage rate data comparisons, as Commerce indicated in its Final Decision Memo, id. at 50 ("the Department does not find that wage data from other countries are necessarily appropriate benchmarks with which to compare the Bangladeshi BBS wage data as there are other variables that affect the labor rates across countries"), it would seem that Commerce would accept only a historical analysis of Bangladeshi labor wage rates to evidence aberration. Such a requirement would be unreasonable where, as here, there is an allegation of systemic labor abuse. If Commerce means to state that it will accept labor wage rate data from other countries for purposes of comparison to determine aberration, Commerce should clarify its practice and explain under what circumstances it will accept such data.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's determination is remanded for further consideration consistent with this opinion. Specifically, upon remand, Commerce must:

1) Clarify or reconsider its practice with regard to how Plaintiff can demonstrate quantitatively that data is aberrational given its claims stem from alleged systemic labor abuses; and

2) Explain why the Bangladeshi wage rate data is not aberrational in light of record evidence of systemic labor abuses; or if the data is aberrational why, it is nonetheless the best available information, or reconsider its determination that the Bangladeshi data is the best available information; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 45 days of this date; and it is further

**ORDERED** that Plaintiff shall have 30 days thereafter to file comments on the remand determination; and it is further

**ORDERED** that Defendant shall have 15 days thereafter to file a reply to comments on the remand determination.


            /s/ Claire R. Kelly
            Claire R. Kelly, Judge

Dated: March 16, 2017
       New York, New York