Slip Op. 17-76

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **AD HOC SHRIMP TRADE ACTION COMMITTEE,**<br><br>    Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>    Defendant. | Before: Claire R. Kelly, Judge<br><br>Court No. 15-00279 |

## OPINION

[Sustaining the final results of redetermination, pursuant to court remand, in the ninth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam.]

Dated: June 29, 2017

Nathaniel Jude Maandig Rickard and Roop Kiran Bhatti, Picard, Kentz & Rowe, LLP, of Washington, DC, for plaintiff.

Kara Marie Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of Counsel on the brief was James H. Ahrens, II, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

   Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's

("Commerce") remand determination filed pursuant to the court's order in Ad Hoc Shrimp

Trade Action Committee v. United States, 41 CIT __, 219 F. Supp. 3d 1286 (2017) ("Ad

Hoc Shrimp I").  See Final Results of Redetermination Pursuant to Court Remand, Jun.

7, 2017, ECF No. 66-1 ("Remand Results").

In Ad Hoc Shrimp I, the court remanded to Commerce the final results in the ninth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam") for redetermination of the surrogate data selected to value the labor factor of production in this review. Ad Hoc Shrimp I, 41 CIT at __, 219 F. Supp. 3d at 1300. Specifically, the court remanded for Commerce to explain or reconsider its methodology for demonstrating labor data to be aberrational, and to explain or reconsider why the Bangladeshi labor data the agency selected is not aberrational, in light of record evidence of systemic labor abuses in the Bangladeshi shrimp industry, or to reconsider its selection. See id.

For the reasons that follow, Commerce's Remand Results comply with the court's order in Ad Hoc Shrimp I and accordingly are sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the previous opinion ordering remand to Commerce, and here recounts the facts relevant to the court's review of the Remand Results. See Ad Hoc Shrimp I, 41 CIT at __, 219 F. Supp. 3d at 1288–90.

In the final determination of this administrative review, Commerce selected Bangladesh as the primary surrogate country for valuing respondents' factors of production. Issues and Decision Memorandum for the Final Results, A-552-802, 46–55, (Sept. 8, 2015), ECF No. 18-2 ("Final Decision Memo"). Over objections from Ad Hoc Shrimp Trade Action Committee ("Ad Hoc Shrimp"), Commerce also selected labor wage

rate data from the Bangladeshi shrimp industry to value the labor factor of production.  Id. at 46–55.

Plaintiff, Ad Hoc Shrimp, commenced this action to challenge Commerce's decision to use labor wage rate data for the Bangladeshi shrimp industry, published by the Bangladesh Bureau of Statistics ("BBS"), to value the labor factor of production in this review.  See Mem. L. Support Pl. Ad Hoc Shrimp Trade Action Committee's USCIT Rule 56.2 Mot. J. Agency R. 15–39, Apr. 20, 2016, ECF No. 27.  Ad Hoc Shrimp presented evidence of systemic labor abuses throughout the shrimp industry in Bangladesh, which Ad Hoc Shrimp alleged render the BBS labor data inherently unreliable and aberrational. See id. at 22–28.  Defendant responded that Commerce's determination that the Bangladeshi data was the best available information was supported by substantial evidence, as Plaintiff did not present "specific quantitative evidence" of aberration; that is, Plaintiff did not present quantitative evidence establishing that "labor conditions in Bangladesh depressed wage rates in Bangladesh."  Def.'s Resp. Opp'n Pls.' Rule 56.2 Mots. J. Agency R. 23, Sept. 29, 2016, ECF No. 42 ("Def.'s Resp.").  Defendant and Commerce emphasized that Plaintiff's evidence did not allow the agency to conduct a quantitative analysis of the data, as is its practice for assessing aberration.  Id. at 16–20; see Final Decision Memo at 49–54.  Defendant alleged that, because a quantitative analysis was not possible, Commerce reasonably concluded that Plaintiff had not met its burden of proving aberration.  Def.'s Resp. at 18–20.

The court remanded for Commerce to: 1) clarify or reconsider its practice with regard to how Plaintiff can demonstrate quantitatively that data is aberrational given its

claims stem from alleged systemic labor abuses; and 2) explain why the Bangladeshi wage rate data is not aberrational in light of record evidence of systemic labor abuses; or if the data is aberrational why, it is nonetheless the best available information, or reconsider its determination that the Bangladeshi data is the best available information. Ad Hoc Shrimp I, 41 CIT at __, 219 F. Supp. 3d at 1300.

Commerce filed the Remand Results on June 7, 2017. Commerce reconsidered its requirement of a quantitative analysis for evaluating a claim of aberrational labor data, concluding that a quantitative analysis is not reasonable where, as here, the petitioner has presented evidence of systemic labor abuse. Remand Results at 8. Commerce explained that, because "wages among economically comparable countries and across industries often vary considerably," it determined that "a quantitative comparison of data across countries, or within a single country, does little to address whether or not a labor value is 'aberrational.'" Id. Commerce concluded that "the petitioner cannot reasonably be expected to 'demonstrate quantitatively' that potential surrogate labor values are aberrational when its claims stem from systematic labor abuses." Id. Commerce determined that, in light of the record here and the alternate data available, the Bangladeshi wage rate data does not constitute the best available information for valuing the labor factor of production in this review, id. at 10–11, ultimately selecting the Indian wage rate data on the record instead. Id. at 10.

Following publication of the Remand Results, Ad Hoc Shrimp filed comments in support of the remand determination, noting "the absence of any challenge to the Remand Results from any party to this proceeding" and requesting that the court sustain the

Court No. 15-00279                                                                                                    Page 5

Remand Results.  Pl. Ad Hoc Shrimp Trade Action Committee's Comments on Remand Results 1–2, Jun. 12, 2017, ECF No. 67.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012),[1] which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

To determine normal value for subject merchandise exported from a nonmarket economy country,[2] Commerce uses surrogate values for the factors of production ("FOP")

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[2] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  19 U.S.C. § 1677b(c)(1).

"based on the best available information[3] regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."[4]  19 U.S.C. § 1677b(c)(1); see 19 C.F.R. §§ 351.408(a)–(c) (2015).[5] Commerce determines what data constitutes the best available information using criteria developed through practice.[6]  Qingdao Sea–Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  Commerce has a regulatory preference to value all FOPs using data from a single surrogate country, 19 C.F.R. § 351.408(c)(2), and its current practice is to value labor using industry-specific data from the primary surrogate country, as published in Chapter 6A of the ILO Yearbook of Labor Statistics.  Antidumping Methodologies in Proceedings Involving Non Market Economies: Valuing the Factor of Production, Labor, 76 Fed. Reg. 36,092, 36,093 (Jun. 21, 2011); see Final Decision

---

[3] As "best available information" is not statutorily defined, Commerce has discretion to determine what data constitutes the best available information in a given case and to value the FOPs accordingly.  See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011); Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (Commerce has considerable discretion in choosing the surrogate values that most accurately reflect the price that the NME producer would have paid had it purchased the FOP from a market economy country). This discretion is broad but is not unlimited; "the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible."  Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

[4] Commerce selects for each FOP a surrogate value from a market economy country that is economically comparable to the NME country and a significant producer of the merchandise in question.  19 U.S.C. §§ 1677b(c)(4)(A)–(B); 19 C.F.R. § 351.408(b) (2015).

[5] Further citations to Title 19 of the Code of Federal Regulations are to the 2015 edition.

[6] To determine what constitutes the best available information, Commerce evaluates the quality and reliability of data sources from the countries offered to value respondents' FOPs favoring data that is: (1) specific to the input in question; (2) representative of a broad market average of prices; (3) net of taxes and import duties; (4) contemporaneous with the period of review; and (5) publicly available.  See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited Jun. 26, 2017); see also Qingdao Sea–Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

Memo at 46. Where ILO rates are not available, Commerce's preferred practice is to use industry-specific labor wage rate data from the primary surrogate country. Final Decision Memo at 46, 48.

Commerce has acknowledged that aberrational values should not be used to value FOPs. Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997). Where there is evidence that data is aberrational, Commerce must address that evidence in order to demonstrate that the data is nonetheless the best information available. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Commerce's usual practice for determining whether data is aberrational is to require a quantitative analysis, comparing either data from economically comparable countries or historical data from the country at issue to determine if the data is unreliable or an outlier. See Remand Results at 7–8.

In Ad Hoc Shrimp I, the court determined that Commerce had not addressed Ad Hoc Shrimp's evidence of alleged systemic labor abuses and thus had not reasonably found the BBS labor data to be the best available information on the record. See Ad Hoc Shrimp I, 41 CIT at __, 219 F. Supp. 3d at 1294–1300. The court remanded to Commerce to clarify or reconsider its determination. Id., 41 CIT at __, 219 F. Supp. 3d at 1300.

On remand, Commerce complied with the court's order. Commerce reconsidered its methodology for determining whether labor data is aberrational. Remand Results at 5–9. Commerce concluded that, due to the distinct nature of the labor FOP, a quantitative analysis for assessing whether prospective surrogate labor values are aberrational is not

reasonable.[7]  Id. at 8.  Thus, Commerce concluded that, due to the distinct nature of the labor FOP, its "normal practice of determining if a surrogate value is 'aberrational' using a quantitative analysis cannot, and does not, provide a path by which the petitioner can demonstrate that the Bangladeshi wage rate data are aberrational, given its claim of systemic labor abuses."[8]  Id. at 9.

Commerce subsequently reconsidered its determination that the Bangladeshi BBS data constitutes the best available information:

> Although the Department's practice with respect to claims of aberration does not enable the petitioner to demonstrate quantitatively that the Bangladeshi data are aberrational in light of its claim, we acknowledge that additional considerations may affect a determination as to whether potential surrogate value data constitute the best available information. Given the Court's concerns with respect to the evidence of labor abuses in Bangladesh provided by the petitioner, and given that there are no allegations of systematic labor abuses specific to the shrimp processing industries in certain other potential surrogate countries on the record, we have elected to conclude that the Bangladeshi wage rate is not the best available information on the record with which to value the respondents' labor FOPs.

Id. at 10.  Commerce concluded that, notwithstanding the primary surrogate country selection of Bangladesh, the Indian wage rate data on the record constituted the best available information to value the labor FOP in this review.  Id.

---

[7] Commerce determined that "a quantitative comparison of data across countries, or within a single country, does little to address whether or not a labor value is 'aberrational,'" because "wages among economically comparable countries and across industries often vary considerably."  Remand Results at 9.  Commerce likewise determined that "the petitioner cannot reasonably be expected to 'demonstrate quantitatively' that potential surrogate labor values are aberrational when its claims stem from systematic labor abuses."  Id. at 8.

[8] Commerce did not indicate how a petitioner could demonstrate labor wage rate data to be aberrational, when the claim is one of systemic labor abuses or otherwise.

Commerce has complied with the court's order.  No party challenges Commerce's Remand Results, and the Remand Results are sustained.

## CONCLUSION

In accordance with the foregoing, Commerce's final determination on remand complies with the court's order and is sustained.  Judgment will enter accordingly.

                          /s/ Claire R. Kelly
                         Claire R. Kelly, Judge

Dated: June 29, 2017
       New York, New York